IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| **DOLLATINE E. RINDERER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Civil No. 14-cv-828-CJP**[1] |
| | ) | |
| **CAROLYN W. COLVIN,** | ) | |
| **Acting Commissioner of Social** | ) | |
| **Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

### **MEMORANDUM and ORDER**

**PROUD, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff Dollatine E. Rinderer seeks judicial review of the final agency decision denying her application for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) benefits pursuant to 42 U.S.C. § 423.

### **Procedural History**

Plaintiff applied for benefits in July, 2010, alleging disability beginning on May 30, 2009. (Tr. 24). After holding an evidentiary hearing, ALJ William L. Hafer denied the application on September 25, 2012. (Tr. 24-34). The Appeals Council denied review, and the decision of the ALJ became the final agency decision. (Tr. 9). Administrative remedies have been exhausted and a timely complaint was filed in this Court.

### **Issues Raised by Plaintiff**

---

[1] This case was referred to the undersigned for final disposition on consent of the parties, pursuant to 28 U.S.C. §636(c). See, Doc. 24.

Now represented by counsel, plaintiff raises the following points:

1.     Plaintiff was not represented at the agency level, and the ALJ failed to fully and fairly develop the record.

2.     The ALJ failed to address plaintiff's sleep apnea.

3.     The ALJ failed to account for limitations arising from plaintiff's migraine headaches, neuropathy in her hands, knee pain, obesity, and need to use a cane.

## **Applicable Legal Standards**

To qualify for DIB or SSI, a claimant must be disabled within the meaning of the applicable statutes.[2]   For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."   42 U.S.C. §423(d)(1)(A).

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.   42 U.S.C. §423(d)(3).   "Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit.   20 C.F.R. § 404.1572.

---

[2]  The statutes and regulations pertaining to Disability Insurance Benefits (DIB) are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404.   The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, et seq., and 20 C.F.R. pt. 416.   As is relevant to this case, the DIB and SSI statutes are identical.   Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations. Most citations herein are to the DIB regulations out of convenience.

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled.   The Seventh Circuit Court of Appeals has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

*Weatherbee v. Astrue*, 649 F.3d 565, 568-569 (7th Cir. 2011).

Stated another way, it must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience.   20 C.F.R. § 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-513 (7th Cir. 2009).

If the answer at steps one and two is "yes," the claimant will automatically be found disabled if he or she suffers from a listed impairment, determined at step three.   If the claimant does not have a listed impairment at step three, and cannot

3

perform his or her past work (step four), the burden shifts to the Commissioner at step five to show that the claimant can perform some other job.  *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984).   See also, *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001) (Under the five-step evaluation, an "affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled.... If a claimant reaches step 5, the burden shifts to the ALJ to establish that the claimant is capable of performing work in the national economy.").

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made.   It is important to recognize that the scope of review is limited.   "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g).   Thus, this Court must determine not whether Ms. Rinderer was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made.   See, *Books v. Chater*, 91 F.3d 972, 977-78 (7th Cir. 1996) (citing *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995)).

The Supreme Court has defined "substantial evidence" as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 91 S. Ct. 1420, 1427 (1971).   In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ.   *Brewer v. Chater*, 103 F.3d

4

1384, 1390 (7th Cir. 1997).   However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner.   See, *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

## The Decision of the ALJ

ALJ Hafer followed the five-step analytical framework described above.   He determined that plaintiff had worked part-time since the alleged onset date, but her work did not rise to the level of substantial gainful employment.   She was insured for DIB through June 30, 2015.   He found that plaintiff had severe impairments of degenerative arthritis of the knees, obesity, migraine headaches, and peripheral neuropathy.   He further determined that plaintiff's impairments do not meet or equal a listed impairment.

The ALJ found that plaintiff had the residual functional capacity (RFC) to perform work at the sedentary exertional level, with a number of physical limitations.   Based on the testimony of a vocational expert, the ALJ found that plaintiff was not able to do her past relevant work.   She was, however, not disabled because she was able to do other jobs which exist in significant numbers in the local and national economies.

## The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order.   The following summary of the record is directed to the points raised by plaintiff and is confined to the relevant time period.

**1.    Agency Forms**

5

Plaintiff was born in 1966, and was 42 years old on the alleged onset date. (Tr. 145).

Plaintiff worked in the past as a front desk clerk in a hotel, a manager at a pay day loan company, and a team leader for a retail demonstration company.   She completed two years of college.   (Tr. 151).

Plaintiff submitted a Function Report in September, 2010, in which she stated that she lived with her daughter, who did most of the household chores. Plaintiff did some dusting, laundry and dishes, but she took breaks when she needed to.   Neuropathy caused swelling in her feet and numbness in her hands. She had migraine headaches about 4 times a month.   When she had a migraine, she became sick to her stomach and had to lie down for several hours.   She said that she had difficulty with activities such as sitting, standing, walking, and using her hands.   She had surgery on her left knee in July, 2009, and still wore a brace on her left knee.   She sometimes used a cane when she walked.   (Tr. 170-183).

In December, 2010, plaintiff reported that her neuropathy had gotten worse, and she was having more frequent migraine headaches.   (Tr. 208).   In January, 2011, plaintiff reported that, on some days, she had trouble walking without a cane and a brace on her left knee.   She had started having tremors in her hands and legs.   Her feet and hands were swollen.   She took a number of medications which made her sleepy.   (Tr. 226-233).

In June, 2011, plaintiff reported that she had lost her insurance coverage. The pain in her knees and swelling in her feet were worse, and her doctor told her this would happen until she was able to get her medications.   (Tr. 247).

### 2.    Evidentiary Hearing

Ms. Rinderer was not represented by an attorney at the evidentiary hearing on September 12, 2012.   The ALJ explained to her that she had a right to representation.   She told him that she had tried to find a lawyer, but no one would take her case because she had been unable to continue seeing a doctor or getting medications.   She had no money for doctors.   She was working 6 to 18 hours a week and was "[b]arely able to keep a roof over [her] head if it wasn't for a friend. . . ."  (Tr. 57-62).

Plaintiff was 6' tall and weighed about 295 pounds.   She was working for a company as an "event specialist," which meant that she demonstrated products or handed out samples of food in stores.   Without medications, by the end of the day, she was hurting so badly that she could barely walk.   She had not been able to get prescription pain medication since she lost her medical card (i.e., Medicaid coverage) in February, 2011.   (Tr. 64-67).

She was also out of migraine medication.   She had been to the emergency room in Chester, Illinois, for a migraine a couple of months before the hearing. (Tr. 68).   She had numbness and swelling in her feet because of neuropathy.     Her neuropathy was diagnosed in 2003.   She had been able to work while she was taking medication (Neurontin and Lyrica.)   (Tr. 71).   She had a CPAP machine for sleep apnea, but, when she lost her medical card, she had to give the CPAP machine back.   She had more migraine headaches since she was not using the CPAP machine.   She was able to sleep only 3 or 4 hours a night.   (Tr. 73).   She had to use a cane 4 or 5 times a month because, when her feet were swollen, she would

7

lose her balance.   (Tr. 74).

In response to a question from the ALJ, Ms. Rinderer said she "probably could" do a sedentary type job.   She added, "The only problem is the neuropathy is not just in my feet, it's in my hands and it comes to points where I have difficulty writing."   The ALJ then asked why she could not do a job that did not have "lots of writing."   She answered that she had applied for jobs, but had "not even gotten a call back."   She said she thought she could do such a job, but she had not been able to find an employer willing to give her "a shot."   (Tr. 71-72).

A vocational expert (VE) also testified.   The ALJ asked the VE a hypothetical question which comported with the ultimate RFC assessment, that is, a person of plaintiff's age and work history who was able to do work at the sedentary exertional level, limited to no more than 2 hours standing/walking, only occasional climbing of stairs, stooping, crouching, kneeling, and crawling, with no climbing of ladders, ropes or scaffolds.   She should never work at unprotected heights or around dangerous machinery.   The VE testified that this person could not do plaintiff's past work.   However, she could do other jobs in the national and regional economy.   Examples of such jobs are hand packer (DOT 920.687-030) and production worker assembler (DOT 559.687-034).   (Tr. 75-76).   Ms. Rinderer questioned how many of those jobs were available in southern Illinois.   (Tr. 77).

The ALJ asked Ms. Rinderer whether there was anything else she wanted to say.   She again stated that she had neuropathy in her hands and it "gets to the point that my hands will draw up even into, like almost a clutch or a claw."   She described the feeling as a "charley horse," but more painful.   (Tr. 77-78).

8

### 3. Medical Treatment

Plaintiff received primary health care from the Marissa Medical Clinic. On April 8, 2009, she was seen for chronic left knee pain. The doctor suspected arthritis. She was taking medication for migraine headaches. She had been seen in the emergency in the last week for a migraine. (Tr. 306). On April 28, 2009, she said that she was doing product demonstrations at work and was on her feet a lot. Her knee was giving out and she was falling. The doctor injected her knee. (Tr. 305). On May 20, 2009, she complained of numbness and tingling going down her arms into her hands. She had previously been diagnosed with peripheral neuropathy. The doctor increased the dosage of Lyrica. (Tr. 304).

In September, 2009, she was seen at Marissa Medical Clinic for right knee pain. (Tr. 298). In December, 2009, she complained of her left knee swelling and "going out." The doctor ordered physical therapy to help with her knee pain and with weight loss. (Tr. 290-291). In January, 2010, she complained of a migraine headache for 2 days. (Tr. 288). In June, 2010, it was noted that she needed a sleep apnea machine. She had a body mass index of 40. (Tr. 284-285).

In November, 2009. Plaintiff was seen by Dr. Barta, a neurologist, for migraine headaches. She had a history of migraine headaches since the age of 21. She had recently had a lot of stress in her life, and had been having daily headaches. She had been taking Topamax. Dr. Barta noted that she had decreased sensation in her lower extremities in a stocking pattern. She increased the dosage of Topamax and ordered a CT scan of the brain. She noted that plaintiff's peripheral neuropathy was stable on Lyrica. (Tr. 277-278). The CT scan was normal. (Tr.

525).   In January, 2010. Plaintiff told a physical therapist that her headaches had increased in frequency since September, 2009, and that she was having 1 headache a week that lasted for 3 or 4 days.   (Tr. 441).   Another neurologist in Dr. Barta's office saw her in April, 2010, for increased migraine headaches.   He continued Topamax and substituted Imitrex for Maxalt.   He also continued Lyrica for her neuropathy.   (Tr. 276).

Plaintiff went to the emergency room for migraine headaches on March 4, 2010, and April 14, 2010.   (Tr. 356-358, 428-429).   She again went to the emergency room for a migraine headache a week later.   (Tr. 365-367).   She went to the emergency room on July 7, 2010, for a migraine headache that had started on July 3.   (Tr. 375-377).

Ms. Rinderer was treated by Dr. Tony Chien, an orthopedic specialist, for her knee pain.   On May 29, 2009, she complained of left knee pain and "giving way," present since March of 2007, but gradually worsening.   Dr. Chien noted effusion in the left knee.   A 2007 MRI showed a small tear of the medial meniscus.   Dr. Chien recommended arthroscopic surgery.   (Tr. 410-412).   The surgery was done in July, 2009.   (Tr. 483-484).   At a postoperative visit in September, 2009, plaintiff complained of a pressure sensation over her left knee and stiffness of the left knee. She also complained of pain, catching, and giving way of her right knee.   Dr. Chien noted effusion in both knees.   Her gait was normal.   He ordered an MRI of the right knee to rule out internal derangement.   (Tr. 407-408).   The MRI showed severe erosive patellofemoral chondromalacia of the right knee.   Dr. Chien gave her a corticosteroid injection in October, 2009.   In March, 2010, she continued to

10

have pain in both her knees.   X-rays showed joint space narrowing and osteophyte formation in both knees.   Dr. Chien gave her corticosteroid injections in both knees.   (Tr. 401).   She returned to him July, 2010, complaining of constant dull aching pain with intermittent sharp pain in both knees, worse in the left knee.   Her pain was worse with activity and she had been unable to find a desk job.   On exam, she had an antalgic gait.   There was pain with palpation in both knees, and effusion in both knees.   Dr. Chien wrote that he had "a lengthy discussion with the patient regarding her treatment options.   The patient is still too young to have total knee arthroplasty."   He again gave her corticosteroid injections in both knees. (Tr. 399-400).

In October, 2010, plaintiff was seen by Dr. Stephen Burger, a neurologist, for worsening neuropathic pain and paresthesias in her arms and feet, along with worsening migraine headaches.   He said that there were "no interval changes in her neurological exam."   He increased the dosage of Topamax to address her headaches, and increased the dosage of Lyrica to address her neuropathic pain. (Tr. 586).   She returned in December, 2010, complaining of tremors.   Dr. Burger wrote that he did not "necessarily see any difference in her examination" and that "[p]erhaps, she has a mild resting tremor."   He did not think any new medical intervention was needed.   (Tr. 585).

## Analysis

"While a claimant bears the burden of proving disability, the ALJ in a Social Security hearing has a duty to develop a full and fair record."   *Nelms v. Astrue*, 553 F.3d 1093, 1098 (7th Cir. 2009).   Where, as here, the claimant is unrepresented,

the ALJ's duty is "enhanced" such that the ALJ is required to "'scrupulously and conscientiously [ ] probe into, inquire of, and explore for all the relevant facts.' " *Ibid.*, citing *Thompson v. Sullivan*, 933 F.2d 581, 585 (7th Cir.1991).   Further, social security proceedings at the agency level are not adversarial proceedings.   20 C.F.R. §404.900(b).   See also, *Richardson v. Perales*, 91 S. Ct. 1420, 1428 (1971)("We bear in mind that the agency operates essentially, and is intended so to do, as an adjudicator and not as an advocate or adversary.   This is the congressional plan.")

Now represented by counsel, plaintiff argues that the ALJ failed in his duty to develop the record.

The entire transcript of the evidentiary hearing is only 24 pages long.   Aside from the discussion regarding plaintiff's right to representation, plaintiff's testimony was 11 pages long.   (Tr. 63-74).   Plaintiff argues that the ALJ gave short shrift to her attempts to explain that she had pain and limited ability to use her hands because of neuropathy.   The Court agrees.

Ms. Rinderer referenced her difficulties in using her hands at two points in her testimony. The first time, the ALJ's response was to ask her why she could not do a sedentary job that did not include a lot of writing.   (Tr. 71-72).   The second mention was at the end of the hearing.   After the ALJ asked the VE a hypothetical question that did not include any limitations in the use of her hands, the ALJ asked plaintiff if there was anything else she would like to say.   Ms. Rinderer volunteered testimony indicating that her hands "draw up" and it feels like they have "charley horses," but more painful.   Rather than ask any follow-up questions, the ALJ

12

ended the hearing.   (Tr. 77-78).

The ALJ and the Commissioner's brief point out that plaintiff testified that she could do a sedentary job.   See, Tr. 31 & Doc. 29, pp. 11-12.   Ms. Rinderer did testify that she "probably could" do a sedentary job, but she also pointed out that neuropathy caused problems using her hands and it "comes to points where I have difficulty writing."   The ALJ did not ask any follow-up questions about the kinds of problems that plaintiff experienced with using her hands.   If she had problems using her hands to write, it is reasonable to suspect that she had problems using her hands for other functions as well.

In addition, the ALJ failed to follow-up on plaintiff's testimony that she had recently been to the emergency room for migraine headaches.   This was particularly important because she lost her Medicaid coverage in February, 2011, and was no longer able to go the doctor or get prescription medications.   (Tr. 67-68).   The ALJ should have questioned plaintiff about whether she had any other emergency room visits after she lost her Medicaid coverage and should have, at the very least, obtained a copy of the record for the emergency room visit that occurred a couple of months before the hearing.   See, *Nelms*, 553 F.3d at 1099, criticizing the ALJ for failing to probe plaintiff's recent medical treatment and to obtain recent medical records.

The Commissioner suggests that the ALJ sufficiently questioned plaintiff at the hearing because he asked her at the end whether there was anything else she wanted to say.   Doc. 29, p. 11.   However, this argument improperly puts the onus on the unrepresented claimant to identify what information is relevant.   Again, it

13

was the ALJ's duty to fully and fairly develop the record.

Plaintiff argues that the failure to enquire more fully into her ability to use her hands was harmful because a person with limited use of her hands could not do the jobs testified to by the VE.   The Commissioner counters this argument by suggesting that the ALJ was justified in finding that plaintiff had no limitations with respect to using her hands.   She points out that the ALJ found that plaintiff's neuropathy is "stable with medication."   Doc. 29, p. 12.   Of course, this argument ignores the fact that the evidence shows that Ms. Rinderer has been unable to afford prescription medication since she lost her insurance coverage in February, 2011. She also points to the opinions of the state agency consultants, but Dr. Oh's report was written before plaintiff lost her insurance, and Dr. Kim's report, written in March, 2011, gives no indication that he was aware that she could no longer obtain prescription medication for neuropathy.   See, Tr. 569-576, 623-625.

Plaintiff is correct that the jobs identified by the VE require either constant or frequent use of the hands.   The VE identified two jobs: "hand packer" and "production worker assembler."   For hand packer, he gave a DOT number of 920.687-030.   That number corresponds to a hand bander, which is described by the DOT as a person who "wraps trademark bands around cigars."   Per the DOT, that job requires constant reaching, handling and fingering.   For production worker assembler, the VE gave a DOT number of 559.687-034.   That number corresponds to an egg processor.   The DOT description of that job is as follows:

> Removes virus-bearing fluid from fertile chicken eggs for use in manufacturing vaccines, such as influenza vaccine: Saws end off egg, using electric saw, and removes fetal membrane, using tweezers to

14

> break sac containing viral fluid. Siphons fluid into sterilized and labeled bottles for further processing. Sterilizes tweezers by dipping them into antiseptic solution after each egg has been harvested.

Per the DOT, that job requires frequent reaching and handling.   If, as she testified, plaintiff has trouble using her hands to write, it is difficult to understand how she could do jobs that require either constant handling and fingering or frequent handling.   In any event, the VE was not asked to assume that plaintiff had any limitations in using her hands.

The Seventh Circuit has recently questioned the reliance of ALJs and VEs on the *Dictionary of Occupational Titles* at step five of the sequential analysis.   "A further problem is that the job descriptions used by the Social Security Administration come from a 23–year–old edition of the *Dictionary of Occupational Titles*, which is no longer published, and mainly moreover from information from 1977 – 37 years ago. No doubt many of the jobs have changed and some have disappeared. We have no idea how vocational experts and administrative law judges deal with this problem."   *Browning v. Colvin*, 766 F.3d 702, 709 (7th Cir. 2014).

In *Browning*, as here, the VE testified that the hypothetical person could do the job of hand packer, and gave a DOT number of 920.687-030.   The Seventh Circuit pointed out that there is no occupational title designated as "hand packer" in the DOT, and that the closest category appears to be "hand packager." *Browning*, 766 F.3d at 708.   A copy of the job description of hand packager is attached as an appendix to the *Browning* decision; the job of hand packager is performed at the medium exertional level and is obviously not suitable for a person with an RFC of a limited range of sedentary work.

15

*Browning* also questioned the basis for the VE's testimony as to the number of jobs available in the local, regional and national economy.   "There is no official source of number of jobs for each job classification in the *Dictionary of Occupational Titles*, and while there are unofficial estimates of jobs in some categories, the vocational experts do not in general, and the vocational expert in this case did not, indicate what those data sources are or vouch for their accuracy." *Browning*, 766 F.3d at 709.

Here, the VE testified that there are about 2,000 "hand packer" jobs in Illinois, and about 32,000 in the nation.   He testified that there are about 1,000 "production worker assembler" jobs in Illinois and about 14,000 in the nation. Ms. Rinderer expressed some skepticism as to these numbers at the hearing.   The VE told her that "These are statewide numbers, you know."   The ALJ then observed that the ALJ had also given numbers for the national economy.   The ALJ did not question the VE at all as to the basis of the numbers.   See, Tr. 77. The ALJ did ask the VE whether he was "aware of any conflict" between his testimony and the data in the DOT, and the VE replied "no."   However, "the DOT does not contain information on which to base an estimate of the number of available jobs of a particular kind."   *Voigt v. Colvin*, 781 F.3d 871, 879 (7th Cir. 2015).   See also, *Browning*, 766 F.3d at 709.

The Commissioner bears the burden at step 5 of the sequential analysis of establishing that the claimant can perform jobs that exist in the economy. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).   In view of the fact that plaintiff was unrepresented, the Court cannot say on this record that the evidence

16

was sufficient to support the Commissioner's conclusion at step 5.

The Court also agrees that the ALJ failed to sufficiently explain his conclusions regarding whether any limitations were caused by plaintiff's migraine headaches and, if so, how his RFC assessment accounted for those limitations.

RFC is "the most you can still do despite your limitations."   20 C.F.R. §1545(a).   In assessing RFC, the ALJ is required to consider all of the claimant's "medically determinable impairments and all relevant evidence in the record." *Ibid.*

As was noted above, the ALJ did not follow up on plaintiff's testimony that she had been to the emergency room a few months before the hearing for a migraine headache, and did not obtain those records.   In analyzing the medical evidence, the ALJ failed to note that plaintiff went to the emergency room for migraine headaches on four occasions between March 4, 2010, and July 7, 2010.   (Tr. 356-358, 365-367, 375-377, 428-429).   Plaintiff still had Medicaid coverage during this period.   Thus, the emergency room visits during this period suggest that, even while she was taking prescription medication, her migraines were not under control.   While he is not required to discuss every piece of evidence in the record, the ALJ is not permitted to cherry-pick the record, ignoring evidence that undermines his conclusion.   *Scrogham v. Colvin*, 765 F.3d 685, 698 (7th Cir. 2014).

Further, the ALJ twice mentioned that CT scans of plaintiff's head were normal.   See, Tr. 29, 30.   However, diagnostic tests like MRI studies and CT scans are performed to rule out other causes of headaches, such as tumors, and negative

17

results do not mean that the patient does not have migraine headaches or that the headaches are not severe. *Moon v. Colvin*, 763 F.3d 718, 722 (7th Cir. 2014), citing "Migraines: Tests and Diagnosis,"http:// www.mayoclinic.org/diseases -conditions/migraine-headache/basics/tests-diagnosis/con–20026358.

This is not to say that the ALJ was required to find that Ms. Rinderer had limitations arising from migraine headaches. He was, however, required to "explain his analysis of the evidence with enough detail and clarity to permit meaningful appellate review." *Scrogham*, 765 F.3d at 695, citing *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005). The ALJ found that Ms. Rinderer's migraine headaches were a severe impairment, but the Court is left in the dark as to what limitations, if any, arose from those headaches or how the RFC assessment accommodated those limitations. "If a decision 'lacks evidentiary support or is so poorly articulated as to prevent meaningful review,' a remand is required." *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012), citing *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). See also, *Stewart v. Astrue*, 561 F.3d 679, 684 (7th Cir. 2009) ("[A] a denial of benefits cannot be sustained where an ALJ failed to articulate the bases of his assessment of a claimant's impairment.")

Lastly, the ALJ's reliance on plaintiff's ability to work part-time is questionable. Plaintiff testified that she worked 6 to 18 hours a week and that, without prescription pain medication, she was barely able to walk by the end of the day. (Tr. 66). She testified that she had to work because she needed the income and that she would be barely able to "keep a roof over [her] head" without the help of a friend. (Tr. 66). The ALJ ignored this testimony. "The fact that [plaintiff]

18

pushed herself to work part-time and maintain some minimal level of financial stability, despite her pain, does not preclude her from establishing that she was disabled." *Roddy v. Astrue*, 705 F.3d 631, 638 (7th Cir. 2013).

Because of the ALJ's errors, this case must be remanded.   The Court wishes to stress that this Memorandum and Order should not be construed as an indication that the Court believes that Ms. Rinderer was disabled during the relevant period or that she should be awarded benefits.   On the contrary, the Court has not formed any opinions in that regard, and leaves those issues to be determined by the Commissioner after further proceedings.

## Conclusion

The Commissioner's final decision denying Dollatine E. Rinderer's application for social security disability benefits is **REVERSED** and **REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of 42 U.S.C. §405(g).

The Clerk of Court is directed to enter judgment in favor of plaintiff.

**IT IS SO ORDERED.**

**DATE:   June 11, 2015.**


**s/ Clifford J. Proud**
**CLIFFORD J. PROUD**
**UNITED STATES MAGISTRATE JUDGE**